WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cassius Clayton Whitehead, | No. CV-14-2481-TUC-LCK |
| Petitioner, | **ORDER** |
| v. | |
| Charles L. Ryan, et al., | |
| Respondents. | |

Petitioner Cassius Whitehead has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Before the Court are the Petition (Doc. 1), Respondents' Answer (Doc. 20), and Petitioner's Reply and accompanying declaration (Docs. 29, 30). The parties have consented to Magistrate Judge jurisdiction. (Doc. 34.)

## FACTUAL AND PROCEDURAL BACKGROUND

Whitehead was convicted in the Pima County Superior Court on four counts of armed robbery, five counts of kidnapping, ten counts of aggravated assault, and five counts of attempted first-degree murder. (Doc. 20, Ex. U.) The trial judge sentenced Whitehead to prison terms totaling 118 years. (*Id.*)

The Arizona Court of Appeals summarized the facts in support of Whitehead's convictions:

> Whitehead entered a bank wearing a ski mask and gloves. He pointed a gun at bank employees and ordered them to give him cash from the bank vault and cash drawers. Some of these items included tracking devices. A key from the bank also fell in the bag. Whitehead left the bank in a car that police officers found abandoned about ten minutes later.

Using the tracking system from the bank, officers found Whitehead riding a bicycle away from where a car matching the description of the one driven by the bank robber was parked. The officers saw Whitehead get off the bicycle, pull a gun from his bag and jump over a wall into a residential area. Soon after, he began firing at the officers, injuring two of them. Whitehead then began running away, and an officer shot him, stopping him.

(*Id.*, Ex. A at 2.)

Whitehead appealed and the Arizona Court of Appeals affirmed his convictions and sentences. (*Id.*, Exs. A, E.) Whitehead's Petition for Review to the Arizona Supreme Court was denied. (*Id.*, Exs. B, C.) Whitehead filed a Notice of Post-conviction Relief (PCR). (*Id.*, Ex. V.) He then filed a pro se PCR petition, which he subsequently amended. (*Id.*, Exs. W, X.) After a multi-day evidentiary hearing, the PCR court denied relief. (*Id.*, Ex. Y.) Whitehead appealed and the Arizona Court of Appeals affirmed, adopting the PCR court's ruling. (*Id.*, Exs. Z, AA.)

## **DISCUSSION**

Whitehead raises six claims. (Doc. 1.) Without conceding the point, Respondents do not contend that Whitehead failed to exhaust any of the claims. (Doc. 20 at 11.) Thus, the Court will review all six claims on the merits.

### **Legal Standards for Relief under the AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) created a "highly deferential standard for evaluating state-court rulings' . . . demand[ing] that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997)). Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

- 2 -

28 U.S.C. § 2254(d). The last relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold test under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend the principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable," the petitioner must show that the state court's decision was not merely

incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Visciotti*, 537 U.S. at 25. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as '"fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (Miller-El II). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*, 545 U.S. at 240.

**Claim 1**

Whitehead alleges trial counsel was ineffective for the following reasons: (a) counsel did not conduct sufficient voir dire or strike jurors with law enforcement backgrounds; (b) Whitehead was denied unrestricted access to counsel; (c) counsel failed to preserve a *Batson* challenge based on religious affiliation; (d) counsel failed to conduct an adequate investigation; and (e) counsel failed to communicate and collaborate with co-counsel. Whitehead was represented at trial by Kyle Ipson as lead counsel and Somer Chyz. All of the IAC claims are based on Ipson's performance.

<u>Standard for IAC Claims</u>

IAC claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, to satisfy *Strickland's* first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

A petitioner must affirmatively prove prejudice. *Id.* at 693. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

a.     Jury Selection

Whitehead alleges counsel should have explored the law enforcement connections of jurors Glenn, Sonntag, Fancher, and Wakefield, in light of the victims being police officers.

During jury selection, juror Wakefield stated that she worked for the Attorney General's office as a legal assistant in the civil division and that the agency represented corrections officers and probation officers. (RT 11/3/08 at 116-17, 175.)[1] Juror Fancher stated that her son-in-law was with the Pima County Sheriff but that would not influence her and she had no doubt she could be fair to the defendant. (RT 11/4/08 at 35-36, 172.) In ruling on this claim, the PCR court noted that jurors Fancher and Wakefield were alternates;[2] therefore, Petitioner was not prejudiced by their presence on his jury. (Doc. 20, Ex. Y at 4.) Because they did not serve on the jury that deliberated, there is not a

---

[1] "RT" refers to transcripts filed by Respondents as part of the state court record. (Doc. 21.)

[2] Whitehead alleges that Fancher was not an alternate but served on the jury; he agrees that Wakefield was an alternate. The Court is unable to verify which jurors rendered the verdict based on the available transcripts. Because Whitehead has not rebutted the state court's fact-finding on this point with clear and convincing evidence, the Court accepts it as true. *See* 28 U.S.C. § 2254(e)(1). Further, Whitehead makes no argument specific to Fancher and there are no grounds to find that the outcome of the case would have been different if Fancher had sat in deliberation on the case.

reasonable likelihood Whitehead would not have been convicted if counsel had challenged these jurors for cause.

Juror Sonntag disclosed that he had worked with potential witness Donald Bley for 15 years but stated that would not cause a problem in evaluating his testimony.[3] (RT 11/4/08 at 92-93.) As a contract officer for Raytheon he had contact with federal agents but had no doubt he could be fair to the defendant. (*Id.* at 102.) Also, he had taken business law classes. (*Id.* at 147-48.) During voir dire, juror Glenn stated that he owned "a lot" of guns and shooting was his hobby. (RT 11/4/08 at 131, 154.) He had been employed by the Arizona Department of Corrections for 11 years. (*Id.* at 135-36, 154.) He had knowledge of the law in relation to corrections work and a brother-in-law that was a district attorney out of state. (*Id.* at 148, 165-66.) When asked by the Court, juror Glenn stated that he could be fair to the defendant and the prosecution and make a decision based on the evidence. (*Id.* at 157.)

Whitehead testified during the Rule 32 Evidentiary Hearing that he told counsel Chyz that he had a problem with Glenn and he wanted him off the jury.[4] (RT 3/29/11 at 113.) "Co-counsel Somer Chyz testified that the Petitioner did have reservations about one juror (Glenn) because of his job at the Arizona Department of Corrections, but does not recall a discussion about striking the juror." (Doc. 20, Ex. Y at 4.) Counsel Ipson did not remember a conversation about Glenn. (*Id.*) The PCR Court denied this claim finding no prejudice based on jury selection:

> Each juror was questioned during voir dire concerning whether they could be fair and impartial to the defendant and the prosecution, and would have been removed from the panel if they could not be impartial. The Petitioner is unable to provide any evidence from which this Court can conclude that "but for" these jurors, Petitioner would have been acquitted.

---

[3] Donald Bley did not testify at trial; his brother was a witness.

[4] In the Addendum, Whitehead alleges that juror Glenn looked familiar, lived in his old neighborhood, and looked at him "crazy-eyed." Whitehead did not testify to those facts during the PCR court evidentiary hearing. He also did not testify that he communicated that information to counsel Ipson or Chyz. (RT 4/29/11 at 13.)

(*Id.* at 4.)

Whitehead's argument amounts to a contention that Ipson should have questioned Sonntag and Glenn further about their law enforcement connections. However, Whitehead does not articulate any necessary follow-up questions that were not asked of Glenn or Sonntag. Most critically, both jurors were asked if they could be fair to the defendant, despite their backgrounds, and they both assured the Court that they could.

Even if counsel was deficient for failing to communicate with Whitehead during the voir dire process, there is no evidence that Glenn or Sonntag were biased or that the outcome of the proceeding would have been different if they had been struck. The PCR court's denial of this claim was not objectively unreasonable.

### b.   Access to Counsel

Whitehead alleges he did not have free access to counsel Ipson; specifically, that counsel did not consult with him during jury selection. Whitehead frames this claim as one of complete denial of counsel. Under *United States v. Cronic*, 466 U.S. 648, 659 (1984), prejudice will be presumed if a defendant is denied counsel at a critical stage of the proceedings. This standard is not applicable here because Whitehead's counsel conducted voir dire and peremptory strikes and co-counsel Chyz communicated with Whitehead during that process.[5]

In denying Whitehead's access to counsel claim, the PCR court stated:

> Jail visitation records indicate that Trial Counsel and his investigators met with Petitioner after Trial Counsel's appointment, and this communication was before and included the actual trial. At the evidentiary hearing, Trial Counsel did acknowledge his visits were short in comparison to his investigator's visits with the Petitioner, but the jail records and testimony by Trial Counsel do not establish there was a failure to communicate with Petitioner.

---

[5] Whitehead also cites *Geders v. United States*, 425 U.S. 80 (1976). That case is not applicable because the Sixth Amendment violation in that case was limited solely to a situation where the defendant was denied contact with counsel during an overnight recess that occurred between his direct testimony and cross-examination. 425 U.S. at 91.

(Doc. 20, Ex. Y at 3.) Here, Whitehead is not alleging a general lack of access as addressed by the PCR court. He argues only that he was denied access to counsel during jury selection. As addressed above in subclaim (a), Petitioner has failed to establish prejudice arising from counsel's conduct during jury selection. For the same reason, his access to counsel claim fails.

### c. *Batson* Objection on Religious Grounds

Whitehead alleges counsel was ineffective for failing to preserve a *Batson* challenge to juror L. based on her religious affiliation. On appeal, the court found that counsel had not preserved a challenge based on religious affiliation. (Doc. 20, Ex. A at 10.) The Court went on to note that, although striking a juror based on religious affiliation was improper under state law, the prosecutor's strike was based on his belief that the juror was confrontational not on the impermissible ground of religion. (*Id.* at 11.) The PCR court similarly concluded that Whitehead suffered no prejudice by counsel's actions because the strike of juror L. was not impermissible. (Doc. 20, Ex. Y at 5.)

Central to resolution of this claim is the merit of the underlying state law *Batson* challenge,[6] which was addressed on appeal and by the PCR court. As a general matter, a federal court will not review a state court's determinations on state law. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Johnson v. Sublett*, 63 F.3d 926, 931 (9th Cir. 1995). Under the AEDPA, the Court assesses whether the PCR court's decision, that trial counsel was not ineffective, was an unreasonable application of Supreme Court law to the facts. The appellate court determined that a *Batson* challenge based on religious affiliation would not have been successful. Thus, Whitehead cannot establish prejudice because there is not a reasonable probability that he would have won

---

[6] As discussed below in Claim 4, the United States Supreme Court has not recognized a *Batson* claim based on religious affiliation. However, Arizona does recognize such a claim. *State v. Purcell*, 18 P.3d 113, 120, 199 Ariz. 319, 326 (Ct. App. 2001).

relief if trial counsel had preserved the claim for appeal. The PCR court's decision–that Petitioner's trial counsel was not ineffective for failing to preserve the Batson challenge–was not an unreasonable application of *Strickland* to the facts.

   d.   Pretrial Investigation and Preparation

Whitehead argues that Ipson's pretrial preparation was inadequate, as evidenced by: (i) failing to timely provide a notice of defenses to the prosecution along with a witness and exhibit list, and failure to file with the court a joint pretrial statement; (ii) failing to timely investigate and provide factual support for the "dual-defense" (misidentification and third-party culpability) including eyewitnesses, medical personnel and first responders, and TPD officers; (iii) failing to present medical records and a medical expert; (iv) failing to retain a ballistics expert; (v) failing to retain and prepare an ID expert prior to trial; and (vi) not calling the witnesses he expressed an intent to call.

   i.   *Pretrial Filings*

Whitehead alleges that counsel failed to timely provide a notice of defenses and witness and exhibit lists, and failed to file a joint pretrial statement. The PCR court found counsel's conduct unreasonable – "[t]rial Counsel was late in his disclosure of witnesses, failed to obtain Board of Inquiry transcripts, and failed to file a joint pretrial statement." (Doc. 20, Ex. Y at 3.) However, the court concluded that Whitehead was not prejudiced by counsel's omissions. (*Id.*) With respect to counsel's failure to obtain Board of Inquiry transcripts, the PCR court found that Petitioner "is unable to point to a particular line of questioning or discrepancies between the testimony at trial and the transcripts which undermine the credibility of police officer testimony." (Doc. 20, Ex. Y at 6.) Therefore, the PCR court found no prejudice arising from counsel's actions on cross-examination. (*Id.*)

The Court finds these rulings were not objectively unreasonable. The trial court did not preclude the defense from introducing any evidence due to late disclosures.

Whitehead fails to identify any prejudice arising from counsel's omissions. Therefore, this subclaim is without merit.

### ii. *Investigation*

Whitehead argues that counsel conducted an untimely and inadequate investigation. After a multi-day evidentiary hearing, the PCR court addressed Whitehead's claim that counsel conducted a deficient investigation:

> Trial counsel's testimony was that he relied on the interviews conducted prior to being assigned the case, using interviews conducted by the State and Defendant's previous attorney to determine whether a witness would provide favorable testimony. At an evidentiary hearing on March 28, 2011, Trial Counsel testified that his investigators attempted to contact witnesses who lived in an apartment complex near the scene of the shooting, but found that these witnesses no longer lived in the complex. Trial Counsel in his testimony also told of his frustration with the Petitioner who told counsel that he knew who committed the crimes, but would not disclose this person's name.
>
> At the March 29, 2011 Evidentiary Hearing, Trial Counsel further testified that there were at least three visits to the scene of the crime to attempt to interview witnesses, he reviewed nine boxes of material, and investigated several potential defenses. Trial Counsel testified about his attempt to connect this crime to another robbery in the area, but upon further investigation found the description of the unmasked perpetrator who robbed a check cashing business, did not match the description of the individual in this case.

(Doc. 20, Ex. Y at 3.) The PCR court concluded that, even if Whitehead could establish an inadequate investigation, he failed to establish any prejudice from the absence of additional witnesses. (*Id.*) Regarding which witnesses counsel called at trial, the PCR court held that is a tactical decision not subject to an ineffectiveness claim if there is a reasoned basis. (Doc. 20, Ex. Y at 5.) The PCR court concluded that Petitioner had not established how the cited witnesses would have changed the outcome of the trial. (*Id.*) Therefore, the court found Petitioner had not shown counsel's actions to be deficient or that he was prejudiced by Ipson's decision. (*Id.*)

Whitehead argues he was prejudiced by the inadequate investigation because Ipson could have presented the following evidence: witness Kyle Colberg could have testified that she was able to drive down Jerrie street (despite a quad covering that street)

and heard a number of shots; Officer Magos saw a black male inside the "quadded" area, west of where Whitehead was shot, he saw somebody enter a residence, and he saw a vehicle speed off; other witnesses testified to hearing a "gun battle" and that officers were returning fire; and Aaron Wilmore as an alternate suspect.

Ipson testified that he read all nine boxes of disclosure from the state and used anything helpful. (RT 3/29/11 at 36-37; RT 6/20/11 at 78.) He used the witness statements to determine whether follow-up with a particular person would be worthwhile. (RT 3/29/11 at 42.) In making those decisions he considered that numerous police officers identified Whitehead as the shooter. (*Id.* at 43.) Ipson testified that, based on his professional judgment, he made a tactical decision not to call any fact witnesses because they were not helpful or would have created unwanted confusion. (RT 6/20/11 at 46-47, 54.) Ipson was confident he pursued all possible defenses for Whitehead based on the available evidence. (RT 3/29/11 at 57.) Ipson testified that members of the defense team visited the crime scene at least three times prior to trial, attempting to locate witnesses and get the layout of the area. (*Id.* at 17-18, 35.) Ipson believed the investigator could not locate any of the witnesses. (RT 3/28/11 at 42, 43.) He testified that "we did just about everything we could to find people and interview people." (*Id.* at 100.)

Whitehead argues that, during PCR proceedings, advisory counsel for Whitehead located witness Kyle Colberg, which contradicted Ipson's testimony that no witnesses could be located. Regardless, Colberg's proposed testimony does not call into question the verdict of guilt. Although she was able to enter the "quadded" area, she was seen doing so and interviewed by the police.[7] This does not support an implication that someone else entered or left the area unseen. Officer Magos's observations also do not implicate the jury verdict. All of the officers testified the shooting was coming from the northeast corner of the block. Therefore, observations of what was occurring in the

---

[7] Officer Heather Mah testified that the purpose of setting up the quad was so that anyone entering or leaving the area would be seen by an officer. (RT 11/6/08 at 156-57.)

western portion of the "quadded" area are not highly probative as to the shooter's identity. Further, Whitehead was shot heading west less than a minute after the shooter fired his last shots. (RT 11/12/08 at 92-93, 171.) If someone else was the shooter, they could not have moved unseen to a location west of Whitehead in the gap between the shooting and Whitehead being struck.

Whitehead argues that witnesses from the neighborhood supported the idea that there was a shooter in another location and Ipson failed to investigate that possibility.[8] Ipson testified that he ultimately did not call the witnesses on his pretrial list because some of them could not be located and others did not have useful information. (RT 3/28/11 at 70-71.) Ipson stated that his investigator went to the apartment complex across the street from the shooting but was unsuccessful in locating witnesses that had stated they saw a light-skinned black male run through their complex. (RT 3/28/11 at 40-41.) Two of the witnesses (Davis and Gonzales), from the apartments on the north side of Pima Street,[9] had given statements indicating a man with a gun may have been located at their apartment complex. (RT 3/29/11 at 11-12.) Mr. Ipson did not find those statements very probative because a person located at those apartments could not have fired the shots at the officers, based on where the officers were located, the site from where the officers heard the shots originating, and the location of the bullets. (*Id.* at 12-13, 26, 64-66; RT

---

[8] Whitehead cites the following evidence from witness statements: witness Davis saw a man similar to defendant pointing a gun and he described a "gun battle"; Witness Gonzales heard 30-40 shots back and forth; Witness Nichols saw an officer and assailant shooting back and forth and then a man running really fast; Witness Martin saw a hand over the wall shooting and officers shooting back; Witness Blackshear described alternate shotgun blasts and handgun fire; Witness Bley heard two different calibers shooting back and forth; and Officer Ramsey said they did not know from what location the shots originated. In contrast to these statements, all of the officers' weapons were checked and only one shot had been fired, which was from the gun of the officer that shot Whitehead.

[9] Although Whitehead indicated that Davis lived at the Tuscany Apartments on the north side of Pima Street (RT 3/29/11 at 11), he then called into question whether these witnesses could have been in an apartment complex south of Pima (*id.* at 15-16). There are apartments on Catalina Avenue, south of Pima Street. However, they are halfway down the block on the east side of the road and that location would not have allowed someone to shoot into the front of the officers that were facing west and southwest from the intersection of Pima Street and Catalina Avenue.

6/20/11 at 79-80, 83, 85.) The defense investigator interviewed a Cody Nichols but, based on testimony at the evidentiary hearing, he likely located the wrong person. (RT 3/28/11 at 25; RT 3/29/11 at 30.) Additionally, the witness statement of Nichols indicated seeing something a block down from the scene, which was not exculpatory. (RT 6/20/11 at 32-33.)

Ipson testified that the defense team looked into Aaron Wilmore as an alternative suspect and discovered that he and Whitehead bore no resemblance to one another, so it was not possible officers had mistaken Whitehead for Wilmore, as a third-party suspect. (RT 3/28/11 at 35-36; RT 3/29/11 at 41.) Wilmore was dark skinned, about two inches shorter than Whitehead with a stockier build, and with a "pretty extensive" afro. (RT 3/28/11 at 37.)

In sum, it was not objectively unreasonable for the PCR court to conclude that Whitehead was not prejudiced by Ipson's investigation and decisions on which witnesses to call at trial.

### iv.   *Medical Evidence*

Whitehead argues counsel was ineffective for failing to obtain, review, and utilize all available medical records. He alleges that Officer Berube told the Board of Inquiry that he shot Whitehead on the left side of his body, and the Tucson Fire Department records indicate a wound to his left abdomen. Whitehead alleges there was evidence he was shot more than once. Further, Whitehead alleges counsel should have presented independent expert medical testimony in light of the inconsistencies.

The fact that Whitehead had a wound to his left abdomen does not contradict testimony that he was shot on the right side because evidence established that the bullet exited Whitehead's body (although it was not recovered). Further, counsel Ipson testified at the PCR evidentiary hearing that he was concerned further investigation on this point would confirm that Whitehead had been shot by Officer Berube. (RT 3/28/11 at 68.) Because counsel wanted to leave open the argument that a third-party shooter shot

Whitehead, not Officer Berube, he testified to making a strategic decision not to pursue this issue further. Whitehead has not carried his heavy burden to demonstrate that counsel's decision on this point was not sound trial strategy. *See Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009).

   v.   *Ballistics Expert*

Whitehead argues that counsel should have retained a ballistics expert. He argues, generally, that counsel Ipson could not adequately cross-examine the officers about the ballistics without obtaining his own independent forensics investigation. In particular, he contends that if an expert had challenged the state's theory about the location of the shooter, in contradiction of Officer Mah's testimony, it would have undermined her testimony regarding the identity of the shooter.

The PCR court found that it "strains credulity" to find that a ballistics expert could have "completely undermine[d] the testimony of multiple police officers" as to the events of the shootings. (Doc. 20, Ex. Y at 6.) Therefore, the Court found no prejudice arising from counsel's failure to retain a ballistics expert.

Officer Mah was not alone in her testimony about the location of the shooter. Although she was the only officer that testified to seeing the shooter's face during any of the shooting, numerous officers testified that the person shooting was in the same yard identified by Officer Mah. Additionally, several officers testified to seeing the shooter in the back of a pickup truck inside the yard.

Officer Mah did not mention the truck, but she testified that the suspect must have been "standing on something" when he placed his hands on the wall and fired his weapon. (RT 11/6/08 at 159.) Whitehead relies upon the testimony of Detective Hanson that a person could not have used the wall as a rest if he was in the truck, based on the bullet trajectory. (RT 11/7/08 at 153.) Thus, the jury was offered testimony that Officer Mah may have been wrong about the shooter's specific location at the time he fired the first shots. Despite hearing that evidence, the jury concluded there was sufficient

evidence to convict Whitehead. There is not a reasonable probability that additional evidence to support this theory would have changed the outcome of the trial.

A ballistics expert could have called into question the exact angle of particular shots, however, it is pure speculation to suggest such testimony would have undermined the testimony of the officers as to the general location of the shooter. Thus, there is no reason to believe such testimony would have called into question Officer Mah's identification of Whitehead as the shooter. It was not objectively unreasonable for the PCR court to conclude that Whitehead was not prejudiced by counsel's failure to retain a ballistics expert.

(vi)    *ID Expert*

Prior to trial, counsel gave notice that he would be calling an ID expert. However, during trial, he changed experts. Whitehead argues it was deficient for counsel not to retain an ID expert prior to trial. He argues the late retention prevented counsel from using Dr. Davis's theories in cross-examination of the witnesses that identified Whitehead. Further, it led to objections, bench conferences, and two voir dires of Dr. Davis during her direct examination.

With respect to the late retention of identification expert Dr. Deborah Davis, the PCR court found Petitioner's hypothetical argument that the expert would have been more compelling if counsel had retained her earlier was unsupported. (Doc. 20, Ex. Y at 7.) The Court found no prejudice with respect to counsel's retention and preparation of Dr. Davis.

Despite the late retention of Dr. Davis, the trial court did not preclude her testimony or her PowerPoint presentation. It is theoretically possible that counsel could have more effectively utilized the evidence from Dr. Davis with earlier preparation, but Whitehead fails to articulate what counsel could have done. Further, Whitehead has not identified any prejudice arising from the fact that the late disclosure caused interruptions

to Dr. Davis's testimony. The PCR court's denial of this claim for lack of prejudice was not objectively unreasonable.

### e. *Communication with Co-counsel and Inconsistent Theories*

Whitehead argues that counsel Ipson failed to coordinate with co-counsel Chyz regarding defenses, he abandoned a mere presence defense, he presented contradictory theories about who shot Whitehead, and he failed to request a mere presence instruction and/or a third-party defense instruction. (Doc. 1-1 at 51.)

With respect to inconsistencies between statements to the jury by Petitioner's two counsel, the PCR court held that isolated mistakes over the lengthy trial did not amount to ineffective assistance. (Doc. 20, Ex. Y at 9.) During jury selection, counsel Chyz gave a mini-opening in which she twice stated to prospective jurors that Officer Berube shot Whitehead one time and that Whitehead was not culpable but merely present. (RT 11/3/08 at 101-02, 103; RT 11/4/08 at 83-84, 85.) During his opening statement, counsel Ipson stated that the parties did not know if Officer Berube or someone else shot Whitehead. (RT 11/5/08 at 85.) During the course of trial, counsel Ipson told the court that he was relying upon a mistaken identify defense not a true mere presence defense. (RT 11/6/08 at 63-65.) During his closing argument, counsel Ipson questioned who shot Whitehead, was it Officer Berube or someone else? (RT 11/21/08 at 126-27.) He went on to argue that this unknown other person shot at the police officers, not Whitehead. (*Id.* at 128.) The inconsistencies between what counsel Chyz said during jury selection and what counsel Ipson stated during closing arguments 18 days later were insignificant. Both counsel argued that someone else shot at the police, not Whitehead; whether counsel labeled the defense one of mere presence or mistaken identity, they are similar not contradictory. The PCR court's denial of this claim was not objectively unreasonable.

With respect to counsel's failure to request a "mere presence" jury instruction, the PCR court found no prejudice because the jury received an identification instruction and

the evidence of Petitioner's guilt was overwhelming. (Doc. 20, Ex. Y at 9.) The jury was instructed on identification, which was the central issue:

> in addition to showing the commission of these offenses it is necessary and incumbent upon the State to prove beyond a reasonable doubt that the defendant was the one who committed them. If you entertain any reasonable doubt as to the question of the identity of the person who committed these offenses, you must find the defendant not guilty.

(RT 11/24/08 at 13.) The evidence of Whitehead's guilt was substantial, including more than one witness that identified Whitehead as the shooter and others that identified him as being in the same location as the shooter, having the same skin tone and build as the shooter, wearing the same clothes as the shooter, and carrying a gun. There is not a reasonable likelihood that Whitehead would not have been convicted if counsel had continued to pursue a mere presence defense and obtained a mere presence jury instruction or some other third-party defense instruction (which Whitehead fails to articulate with specificity). The PCR court's denial of this claim was not objectively unreasonable.

Finally, Whitehead argues that Ipson failed to discuss the bank robbery during closing argument, which prejudiced him. No witness could identify Whitehead as the person at the bank; the connection to the robbery was the bag containing the tracker packs that Whitehead was seen carrying and that was found in the yard where the shooter fired at the officers. The critical issues for the defense centered on what happened shortly before, during, and after the shootings. As Whitehead acknowledged in his Addendum to the Petition, the shooting dominated the trial, overshadowing the bank robbery. (Doc. 1-1 at 44.) The jury received instructions on the charges arising from the bank robbery. Whitehead fails to articulate any prejudice arising out of the omission from the closing argument. Because he has not established prejudice, this claim fails.

*Conclusion*

The Court considers the cumulative effect of all the IAC allegations raised by Whitehead. The evidence against Whitehead was overwhelming. It included numerous

people that identified him as being in the yard with a gun at the time the shots were fired at the officers. Officer Heather Mah identified Whitehead as the person she saw on the bike (RT 11/6/08 at 152) and looking over the wall at the corner of Pima and Catalina firing at the officers (*id.* at 161-62). Detective Baker identified with certainty Whitehead as the person he saw on the bike, then with a gun, and jumping out of the yard after the shots were fired. (RT 11/12/08 at 57-58, 67, 92.) Charles Bley identified Whitehead as the person that ran east across his yard to his neighbors where the shooting was heard, and that he was the same person that was shot by the police in his yard. (RT 11/19/08 at 172-73, 174, 192.) In light of this evidence and the entirety of the trial record, the Court finds that none of the alleged errors by trial counsel created a reasonable probability that Whitehead would not have been convicted of any of the charges absent counsel's failures.

**Claim 2**

Whitehead alleges he was denied his Sixth Amendment right to counsel free of a conflict of interest based on a conflict between the attorney's personal interest and Whitehead's interests.

Analysis

Whitehead alleged a version of this claim in his amended PCR Petition. (Doc. 20, Ex. X at 92-97.) The focus of the claim was that the investigators operated under a racial bias against Whitehead,[10] but he also mentioned the investigators' law enforcement backgrounds as a conflict.[11] The PCR court found no evidence to support a claim of racial bias by trial counsel or the investigators and denied the claim alleging a conflict of interest. (Doc. 20, Ex. Y at 10.) The PCR court did not address directly a conflict of interest based on Ipson's personal interest. However, because Respondents' addressed

---

[10] Whitehead did not allege a claim of racial bias in the Petition before this Court. Ipson testified at the PCR evidentiary hearing that Whitehead's race did not interfere with his representation of him. (RT 3/28/11 at 102.)

[11] In a declaration, Whitehead states that he included a conflict of interest claim in his post-Rule 32 evidentiary hearing brief, but it was edited out by advisory counsel. (Doc. 30.) The substance of that claim is unknown to the Court.

- 18 -

this claim on the merits, so does the Court. *See* 28 U.S.C. 2254(b)(2) (unexhausted claims may be denied on the merits).

Whitehead alleges generally that the conflict is an ethical one between Ipson's personal interests and the interests of Whitehead. (Doc. 1-2 at 3, 7.) Whitehead cites several facts as evidence of the conflict. First, counsel Ipson used retired TPD officers as investigators when the victims in the case were TPD officers.[12] Second, Whitehead alleges Ipson and the investigators did not conduct a timely, thorough pretrial investigation and Ipson was not adequately prepared for trial. Third, Whitehead contends that Ipson allowed anger and frustration to negatively impact his relationship with Whitehead, in that he treated him with disrespect and attempted to force Whitehead to confess. (*Id.* at 5-6.) He then characterized the conflict in varying ways: Ipson "chose the interests, convenience and regard of members of his staff and jurors with law enforcement background over the legal interests of his client" (Doc. 1-1 at 50); Ipson's personal and business conflicts caused him to be ineffective (Doc. 1-2 at 8); and Ipson had a "third person" conflict under the American Bar Association Model Rules of Professional Conduct 1.7(a)(2), which prohibits representing a client if there is a "significant risk" that the lawyer's representation will be "materially limited by the lawyer's responsibilities" to a third person.

To establish a violation of the Sixth Amendment right to counsel based on a conflict of interest, a defendant must demonstrate that counsel "actively represented conflicting interests," and his performance was defective. *Mickens v. Taylor*, 535 U.S. 162, 175 (2002) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). In other words, a defendant must show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348. The court looks at whether counsel's alleged

---

[12] Whitehead noted serious problems with investigator Tatman and informed Ipson of the conflict. Whitehead alleges that Tatman "[i]nterrogated him, made disrespectful, inflammatory, and unprofessional comments concerning the case and his law enforcement career. Tatman told Petitioner to confess, he was guilty and deserved a long sentence." (Doc. 1-2 at 4.)

deficient performance was the result of a conflict. *Id.* at 349. Here, Whitehead alleges defective performance by Ipson but has not alleged the deficiency was due to a conflict. He alleges only a general personal interest and that Ipson "chose" the interests of his staff over those of his client. However, Whitehead does not allege that Ipson had an actual responsibility to a third party or a personal interest that was in conflict with Whitehead's interests. *Cf. Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008) (noting that courts are concerned only about legal conflicts, which could include a conflict between a lawyer's private interest and that of his client, but does not include a client's distrust of lawyer); *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) (finding that a disagreement over trial strategy does not amount to a conflict of interest). Whitehead alleged all the same deficiencies in Claim 1 to support the IAC claim and the facts will be evaluated in that context. However, he has not alleged he was deprived of his right to counsel due to a conflict.

<u>Motion to Expand the Record</u>[13]

Whitehead seeks discovery, to expand the record, and an evidentiary hearing on Claim 2. First, Whitehead argues he should be allowed to develop this claim because the PCR court rejected his claim of bias for lack of supporting evidence. The PCR court rejected on that ground only Whitehead's claim that counsel had a conflict based on racial bias. (Doc. 20, Ex. Y at 10.) Whitehead did not raise that claim before this Court; therefore, no development is warranted. *See infra* note 10.

Second, Whitehead alleges that the pro se memorandum submitted after the PCR evidentiary hearing, which was filed by advisory counsel, had been edited without his knowledge and the conflict of interest claim deleted. *See infra* note 11. The Court finds this issue irrelevant because the Court, above, addresses on the merits the entirety of the

---

[13] The Court previously denied Whitehead's motion to expand the record without prejudice and stated that it would consider whether further development was warranted at the time it considered the Petition in full. (Doc. 39.) Therefore, the Court now considers the substance of Whitehead's request to develop the record.

claim raised in Whiteheads' federal habeas petition regardless of how it was raised and addressed in state court.

Finally, Whitehead has not alleged what evidence he would develop if the Court granted the motion. Regardless, because the Court found that Whitehead is not entitled to relief, accepting his allegations as true, there is no basis to expand the record or hold a hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 477, 481 (2007).

**Claim 3**

Whitehead alleges the trial court violated his Sixth Amendment right to counsel in denying his request to substitute counsel. He argues that he demonstrated an irreconcilable conflict with Ipson, yet, the court denied the motion.

At an April 7, 2008 hearing, Whitehead asked for a change in counsel due to a breakdown in relationship because appointed counsel Baker-Sipe had not investigated and prepared for trial. (RT 4/7/08 at 5, 16.) The court granted the request, appointing Ipson, but cautioned Whitehead the next appointment would be the last attorney the judge would appoint. (*Id.* at 6.) On September 5, 2008, two months before trial, the trial court heard Whitehead's subsequent motion to represent himself. (RT 9/5/08 at 9.) He stated that he asked to represent himself because the court had told him it would not allow a second request for substitution of counsel, a decision the court affirmed at that September hearing. (*Id.* at 4-5.) Whitehead contended that his counsel was competent but not "adequate." (*Id.* at 4, 14.) Whitehead stated that he had no meaningful communication with counsel; counsel Ipson had visited him three times for 5-10 minutes, one hour, and three hours.[14] (*Id.* at 6-8.) Whitehead expressed concern that counsel had not yet interviewed any defense witnesses, explored discovery, or retained any experts. (*Id.* at 11, 13.) Whitehead stated that he was "compelled" to represent himself. (*Id.* at 16-17.) Ipson

---

[14] Based on the jail visitation logs admitted at the PCR evidentiary hearing, Ipson visited on April 22, 2008, for 15 minutes; on August 27, 2008, for 23 minutes; on September 3, 2008, for 45 minutes, and on September 4, 2008, for 2 hours and 26 minutes. (RT 3/28/11 at 28-29.) Ipson's investigator interviewed Whitehead for almost two hours on May 8, 2008. (*Id.* at 30.)

informed the court that he would be ready for trial in November, he had been discussing pretrial interviews with the prosecutor, he was preparing a *Desserault* motion, a motion to suppress and a motion to preclude, his investigator would be interviewing the list of witnesses from Whitehead, and prior counsel had interviewed 20 prosecution witnesses. (*Id.* at 9, 10, 11, 13, 16, 22.) The Court granted Whitehead self-representation and appointed his two former attorneys as advisory counsel. (*Id.* at 24-25, 37.) Whitehead represented himself until October 10, 2008, when he informed the Court that he would like advisory counsel to represent him going forward. (RT 10/10/08 at 6-8.)

The Arizona Court of Appeals denied the claim:

¶ 8 Because Whitehead ultimately requested that Ipson represent him at trial, he has waived any issue concerning the representation after that point. *See State v. Lamar,* 205 Ariz. 431, ¶¶ 23–24, 72 P.3d 831, 836 (2003) (decision to continue with appointed counsel withdrawal of request for self-representation); *cf. State v. Cruz,* 218 Ariz. 149, ¶ 105, 181 P.3d 196, 213 (2008) (withdrawn objection waived). And Whitehead has not demonstrated that the events occurring between the trial court's denial of substitute counsel and his request that Ipson represent him deprived him of his right to counsel. Thus, Whitehead has failed to show he was prejudiced by the court's denial of his request. *See State v. Doerr,* 193 Ariz. 56, ¶ 33, 969 P.2d 1168, 1176 (1998) ("Error is harmless if we can say beyond a reasonable doubt that it did not affect or contribute to the verdict.").

¶ 9 Moreover, even if we address the merits of his complaint, his claim fails. At the time of the hearing, Ipson had met with Whitehead three times, once briefly, once for an hour and once for three hours. Whitehead's complaints about Ipson's failure to interview witnesses, investigate the case and file motions concern either counsel's competence or his diligence in preparation for trial. But because ineffective assistance of counsel may be raised only in a petition for post-conviction relief, we will not consider the quality of counsel's representation here. *See State v. Torres,* 208 Ariz. 340, ¶¶ 15, 17, 93 P.3d 1056, 1060–61 (2004); *see also State v. Spreitz,* 202 Ariz. 1, ¶ 9, 39 P.3d 525, 527 (2002) ("[I]neffective assistance of counsel claims are to be brought in Rule 32[, Ariz. R. Crim. P.], proceedings" and "will not be addressed by appellate courts" if brought on direct appeal.). And Whitehead provided the trial court with no evidence that the two months remaining before trial would not be sufficient for Ipson to finish interviewing witnesses, investigate and file motions or that Ipson had refused to do so. We cannot find that any conflict could not have been reconciled by Ipson's actions in the time leading up to trial. Additionally, the perceived problems Whitehead alleged did not amount to a complete breakdown in communication or an irreconcilable conflict. Instead, it merely appears that Whitehead would have preferred other counsel. *See Cromwell,* 211 Ariz. 181, ¶ 28, 119 P.3d at 453.

¶ 10 Furthermore, Whitehead wanted to replace Ipson for reasons very

similar to the ones he previously gave for replacing Baker–Sipe. And Whitehead provides no evidence that the same conflicts would not have arisen with another substitution of counsel. Thus, the trial court did not abuse its discretion in denying Whitehead's second motion for substitute counsel. *See Moody,* 192 Ariz. 505, ¶ 11, 968 P.2d at 580.

(Doc. 20, Ex. A at 2-6.)

To the extent Whitehead challenges Ipson's performance at trial, the Court addresses those allegations above in Claim 1. As of October 10, Whitehead requested that Ipson represent him going forward through trial; therefore, he cannot claim he had irreconcilable differences with counsel at that point. In evaluating this claim the Court looks at the information available at the time substitution of counsel was requested through the time Whitehead asked that Ipson be re-appointed.

If a state court denies a motion to substitute counsel, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated. *Schell v. Witek,* 218 F.3d 1017, 1026 (9th Cir. 2000). The Sixth Amendment is not implicated by every conflict between a defendant and counsel. *See Daniels v. Woodford,* 428 F.3d 1181, 1196-97 (9th Cir. 2005), *cert. denied,* 550 U.S. 968 (2007). A defendant is entitled to competent counsel, *United States v. Cronic*, 466 U.S. 648, 655 (1984), and Whitehead has conceded that Ipson met that standard (RT 9/5/08 at 4). A defendant's Sixth Amendment right to counsel does not entitle a defendant to a "meaningful relationship" with that counsel. *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Indigent defendants do not have a Sixth Amendment right to the counsel of their choice. *Gonzalez v. Knowles*, 515 F.3d 1006, 1012 (9th Cir. 2008) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)).

Whitehead relies on an "irreconcilable conflict" with counsel. This is not a concept found in Supreme Court law; thus, it is not central to the question before the Court.[15] However, the Ninth Circuit has held in a habeas case that "a trial court's refusal

---

[15] Whitehead cites state court law to support his contention that he had an irreconcilable conflict with Ipson. (Doc. 1-2 at 91, *citing State v. Torres*, 93 P.3d 1056, 1060, 208 Ariz. 340, 344 (2004).) This Court must look to federal law and may only

to allow substitution of counsel can violate a defendant's Sixth Amendment right to counsel if the defendant and his attorney have an "irreconcilable conflict." *Stenson v. Lambert,* 504 F.3d 873, 886 (9th Cir.2007), *cert. denied,* 523 U.S. 1008 (2008). This level of conflict exists only if communication has so broken down that it prevents the effective assistance of counsel. *Id.* at 886; *Schell,* 218 F.3d at 1026. A court evaluates three factors in determining if a conflict with counsel is "irreconcilable": "(1) the extent of the conflict; (2) the adequacy of the inquiry by the trial court; and (3) the timeliness of the motion for substitution of counsel." *See Stenson,* 504 F.3d at 886.

Here, despite Whitehead's argument that the relationship was "totally fractured," the conflict was not extreme. In support of his assertion, Whitehead focuses on the fact that counsel had not yet done the trial preparation that Whitehead believed should have been completed two months prior to trial. Counsel represented that he could be ready for trial and was preparing motions and prepping for interviews. Whitehead agreed his counsel was competent and he did not allege they were not able to communicate. It does not appear that, at the time Whitehead requested substitution of counsel, there was a complete breakdown of communication. This is supported by their subsequent relationship when Ipson was serving as advisory counsel. After Whitehead was granted leave to represent himself, he had regular communication with the advisory attorneys. At a September 19 hearing, advisory counsel indicated they were visiting Whitehead one or two times per week, would get him a complete file copy, would file his motions, would take a DVD player for him to view evidence, had an investigator assigned to the case, and were assisting him with a *Desserault* motion. (RT 9/19/08 at 13, 17, 18, 22, 25, 30-31.) And, at an October 6 hearing, counsel represented Whitehead in discussing the *Desserault* motion, DNA experts, and disclosure of medical records. (RT 10/6/08 at 6-11, 18-21, 27-28.)

---

grant relief if the state court's decision was contrary to controlling Supreme Court law.

The trial court explored the nature of the conflict during a hearing, discussing the extent of visits and communication with counsel, what pre-trial preparation had been completed and was contemplated by counsel, defendant's concern about the delay in preparing, and the benefit of counsel versus self-representation. (RT 9/5/08 at 5-24.) The motion for substitution was made two months prior to trial. Granting the motion would have required a continuance of the trial, which had already been delayed for substitution of counsel. Because the trial court conducted an adequate evaluation of the conflict, the conflict was not extreme or irreparable, and granting substitution would have delayed trial for a second time, Whitehead's conflict with counsel was not irreconcilable. *See Midkiff v. Lampert*, 125 F. App'x 791, 792 (9th Cir. 2005) (finding no Sixth Amendment violation despite counsel's failure to contact all witnesses identified by defendant and to provide defendant with full discovery, because significant deterioration in communication was not an irreconcilable conflict).

As found by the state court, Whitehead did not have an irreconcilable conflict with Ipson. At a minimum, the state court's denial of this claim was not an unreasonable application of Supreme Court law.

**Claim 4**

Whitehead alleges the trial court violated his Fourteenth Amendment rights by denying his *Batson* challenge. After peremptory strikes, Whitehead's counsel requested that the prosecution provide a race-neutral reason for striking juror L. (RT 11/5/08 at 37.) Although Whitehead did not make a prima facie showing, the prosecutor provided the following explanation:

> Lizetta Smith was a problem for many reasons. The most significant one came up later. So I'm kind of taking these out of order. You had already asked the question of does anybody have a background in social work, any kind of social work. She sat through that, doesn't mention anything. No response to that. Then later on in response to some other question, I can't remember what, she brings up that she was working for an outfit called, I wrote it down, Last Chance Juvenile Offenders.
>
> . . . .

Number one, she doesn't answer about social work, if that's not social work, I don't know what is. Secondly, she's somebody that's involved with an organization for a last chance for juvenile offenders. I think it shows that she may be somebody particularly sympathetic who may have a problem with that idea of sympathy and prejudice, ignoring sympathy, like wanting to salvage people, all people are salvageable, even the defendant should be given another chance. And I think she's somebody that will have a problem with that, finding – being firmly convinced even when the evidence accomplishes that.

She has a brother who is serving time, which alone is not – I mean, I've got a few other people I struck, let me go through that too. I struck Ms. Hammer because she has a son in prison for bad checks. . . .

The guy I left on, I was kind of torn about this, was Karber, and I left him on because he listens to Shawn Hannity, he called 911 numerous times on his son because of his drug addiction, and his son is locked up because of drug addiction. And that is kind of a different scenario to me. That's somebody who feels bad about his son but was calling 911, so he doesn't have a problem with law enforcement.

She wore a T-shirt that was pretty aggressive on the other day.

THE COURT: What does that mean?

MR. MOSHER: It said Christ for Life on it.

THE COURT: That's not aggression. That's just a statement.

MR. MOSHER: It was pretty outgoing.

THE COURT: Well, yeah.

MR MOSHER: I didn't find any other statement of any anybody's religious beliefs or policies [sic] beliefs or anything else in any other juror.

THE COURT: Well, you can't strike her for religious belief.

MR. MOSHER: No, I think it's pretty policy oriented to come in on the first day of the jury selection, and here's a T-shirt outwardly showing some belief system, but I'm talking about that shows to me some kind of confrontational things going on with her.

That's corroborated by the last thing I wanted to talk about is the staring that I get from her towards me quite frequently. I don't know what that's all about but she stares at me a lot, and I'm not saying that she's tried to speak to me or done anything else, but I don't like that vibe of somebody who is constantly staring over at me every time I look up.

Let me make sure I covered everything. There was a rape in 2000 with no prosecution. That's it.

THE COURT: Any response by defense?

MR. IPSON: No.

THE COURT: The Court finds there's no *Batson* violation. It was race neutral. Denied.

(*Id.* at 38-41.) The Arizona Court of Appeals denied this claim:

> ¶ 19 Although not dispositive, that the prosecutor did not strike K. [an African–American man] from the jury suggests a nondiscriminatory motive. *See State v. Cañez,* 202 Ariz. 133, ¶ 23, 42 P.3d 564, 577 (2002). And the prosecutor offered various permissible race-neutral reasons for striking L. *See id.* ¶¶ 18, 28 ("concern regarding candor" race-neutral); *Martinez,* 196 Ariz. 451, ¶ 15, 999 P.2d at 800 (striking social worker because forgiving would be permissible). The trial court did not abuse its discretion in finding the strike was not racially discriminatory. *See Purcell,* 199 Ariz. 319, ¶¶ 22, 29, 18 P.3d at 119, 121–22.
>
> . . . .
>
> ¶ 22 Whitehead suggests that because the prosecutor did not strike a juror who made a delayed response and another who had a son who was incarcerated, it shows the strike of L. was because of her race or religious affiliation. However, he does not show that the other jurors who remained on the jury had the same combination of the many reasons for which the prosecutor struck L. Thus, this comparison does not show that the prosecutor's reasons were not legitimate. *See Purcell,* 199 Ariz. 319, ¶ 23, 18 P.3d at 119. The trial court did not abuse its discretion in denying Whitehead's *Batson* challenge.

(Doc. 20, Ex. A at 8-11.)

In the federal habeas petition, Whitehead's *Batson* challenge is focused on the state's strike of juror L. as being based on her religious affiliation. The Supreme Court has never extended the protections of *Batson* to a juror's religious affiliation. *See Cash v. Barnes*, 532 F. App'x 768, 769 (9th Cir. 2013) (citing *Davis v. Minnesota*, 511 U.S. 1115 (1994)). Therefore, the appellate court's decision on this ground could not be contrary to, or an unreasonable application of, Supreme Court law. Habeas relief on this portion of the claim is not available. *See Carey v. Musladin*, 549 U.S. 70, 74 (2006).

In the federal habeas petition, Whitehead does not clearly raise a *Batson* challenge based on juror L's race. (*See* Doc. 1-2 at 98-107.) However, because the claim is exhausted and Respondent briefed it, the Court will address it. Under *Batson* and its progeny, a defendant's challenge to a peremptory strike requires a three-step analysis. First, the trial court must determine whether the defendant has made a prima facie

showing that the prosecutor exercised a peremptory strike on the basis of race. *See Rice v. Collins,* 546 U.S. 333, 338 (2006). Then, the burden shifts to the prosecutor to present a race-neutral explanation for the peremptory challenge. *Id.* The ultimate question of whether the defendant carried his burden of proving purposeful discrimination is left to the trial court. *Id.*

The court's determination regarding intentional discrimination is a question of fact. *Flowers v. Mississippi*, 136 S. Ct. 2157, 2158 (2016); *Hernandez v. New York*, 500 U.S. 352, 364 (1991) (plurality opinion). Therefore, a habeas petitioner is entitled to relief on a *Batson* claim only if the state court's denial of the claim constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338. Thus, this Court can grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.* In addition, under § 2254(e)(1), "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 38-39. Although "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42. The trial court's credibility finding of the prosecutor's explanation for the strike is entitled to substantial deference. *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (citing *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)).

The explanations offered by the prosecutor for striking L. were not inherently discriminatory and, therefore, were race-neutral under *Batson*. *Rice*, 546 U.S. at 338; *Hernandez*, 500 U.S. 360 ("unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral"). The explanations were specific and supported by the record. *See Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004). They were not implausible or fantastic. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). In fact, in his brief, Petitioner stated that the prosecutor's

explanations "may have been race-neutral." (Doc. 1-2 at 100.) Additionally, both the United States Supreme Court and the Ninth Circuit have utilized comparative juror analyzes to assess whether a prosecutor's race-neutral explanation for a strike was in fact a pretext for a discriminatory strike. *Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination at *Batson*'s third step."); *see Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006); *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006). Here, as pointed out by the court of appeals, the prosecutor did not strike all the African-American jurors. This provides further support to find that the prosecutor's race-neutral explanations were not pretextual.

Petitioner has not rebutted the presumption of correctness that attached to the state court findings that the prosecutor did not intentionally discriminate on the basis of race in striking L. It was not objectively unreasonable for the state courts to find credible the prosecutor's explanation of his reasons for striking L. from the jury. Therefore, Petitioner is not entitled to relief on Claim 4.

**Claim 5**

Whitehead alleges the trial court violated his Sixth and Fourteenth Amendment rights to present a complete defense by denying his request to re-interview witnesses. The Arizona Court of Appeals denied this claim:

> ¶ 24 Under Rule 15.3(a)(2), Ariz. R. Crim. P., a trial court may order an interview when "[a] party shows that the person's testimony is material to the case or necessary adequately to prepare a defense or investigate the offense...." On appeal, Whitehead provides no evidence that the individuals he wished to interview a second time would have provided testimony necessary to prepare his defense or investigate the offense which could not have been discovered during the original interview. He also fails to cite any cases giving a defendant the right to have a second interview with a witness. The trial court did not err in denying Whitehead's motion. *See Conner,* 215 Ariz. 553, ¶ 6, 161 P.3d at 600.

> ¶ 25 Whitehead specifically alleges a "Mendez–Rodriguez violation" and relies on cases discussing *United States v. Mendez–Rodriguez,* 450 F.2d 1 (9th Cir.1971), in support of this argument. *Mendez–Rodriguez* concerned a defendant's opportunity to interview witnesses who had been deported, which is not the case here. 450 F.2d at 2. Moreover, *Mendez–Rodriguez* has

- 29 -

been abrogated such that even where witnesses have been deported, a defendant must show their testimony would have been "both material and favorable to the defense." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 873 (1982). Whitehead has failed to meet this standard, even if it applies.

(Doc. 20, Ex. A at 12-13.)

To establish a violation of the Sixth and Fourteenth Amendment rights to compulsory process and to present a complete defense based on restricted access to witnesses, a defendant must demonstrate that those witnesses could provide evidence that was "both material and favorable to the defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982).[16] Whitehead does not assert that he was denied access to specific witnesses that possessed information favorable and material to his defense. Therefore, the state court's denial of this claim was not an unreasonable application of the law and Whitehead is not entitled to relief.

**Claim 6**

Whitehead alleges his Sixth Amendment rights were violated by an unduly suggestive in-court identification. Whitehead challenges the in-court identification of him by Detective Baker, which he alleges occurred after the prosecutor showed the detective a single photo of Whitehead. The Court of Appeals found this claim waived except for fundamental error review, which the court found Whitehead did not establish. (Doc. 20, Ex. A at 13.)

The Due Process Clause is implicated if police used an identification procedure that was unnecessarily suggestive. *See Neil v. Biggers*, 409 U.S. 188, 201 (1972); *Perry v. Hampshire*, 565 U.S. 228, 238-39 (2012). If so, the Court must evaluate whether the improper procedure created a "substantial likelihood of misidentification." *Biggers*, 409 U.S. at 201. In deciding if the identification is nevertheless reliable, the Court evaluates the totality of circumstances, including:

---

[16] Whitehead relies, in part, upon *United States v. Mendez-Rodriguez*, 450 F.2d 1 (1971), which was abrogated by *Valenzuela-Bernal*.

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200.

At trial, Detective Baker testified that he first observed the suspect from the distance of a street's width as they were looking at one another. (RT 11/12/08 at 54-55.) The detective stated that he looked at the suspect for a few seconds as he drove by, focusing on him and his clothes. (*Id.* at 57.) After following the suspect on the bike, Detective Baker testified he was paying close attention to the individual when the person pulled out a gun and faced the officers with it in his hand. (*Id.* at 65-66.) The detective was certain the person with the gun was the same person he saw on the bicycle. (*Id.* at 67.) After numerous shots were fired, Detective Baker testified that he saw the same person go over a wall. (*Id.* at 92.) After the suspect was shot, Detective Baker saw the person's face and testified he gave him his full attention and was 100% certain it was the same person he had seen on the bike, with the gun, and going over the wall. (*Id.* at 95-97.)

Detective Baker described the person as a light-skinned African-American male, approximately 5' 9", with a thin to medium build. (*Id.* at 55.) The detective stated that the suspect's facial hair did not stand out to him, but he recalled there was some facial hair and it was scruffy. (*Id.* at 56-57.) On cross-examination, Detective Baker stated that he first noticed the facial hair after the suspect had been shot and detained. (*Id.* at 141-42.) At trial, Detective Baker identified Whitehead as the person he saw on the bicycle after the bank robbery. (*Id.* at 58.)

The detective noted that, at trial, the defendant had a defined beard, which was different from his facial hair the day of the crime. (*Id.* at 99.) Subsequently, the prosecutor showed Detective Baker a photograph of Whitehead taken the day of the crime and the detective testified that was the person he saw on the day of the crime and

that he had identified as the defendant at trial. (*Id.* at 110-11.) Detective Baker acknowledged that the prosecutor had shown him the photo, a few days prior, in preparation for trial. (*Id.* at 150.)

There is no question that the person on trial, Whitehead, was the person that was shot and arrested at the scene of the crime. Detective Baker testified that he was certain the person arrested that day was the same person he tracked on the bicycle and that he saw with a gun and jumping over the walls in the neighborhood. That is the critical identification testimony by the detective, which ties what he saw to the person on trial. In light of these findings, the Court determines that Detective Baker's identification of Whitehead was not unduly suggestive (based on a pretrial viewing of the photograph). This is particularly true because Detective Baker had been called to testify at a pretrial hearing just two weeks prior to trial, at which time he had seen Whitehead in person. (RT 10/20/08.) Additionally, Detective Baker had a good opportunity to view the suspect more than once, he was paying close attention when observing him, he gave a reasonably accurate description of defendant, and he was certain in his identification. Therefore, even if it was unduly suggestive for Detective Baker to view the photograph, his identification was nonetheless reliable. The state court's denial of this claim was not objectively unreasonable.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, this Court must issue or deny a certificate of appealability (COA) at the time it issues a final order adverse to the applicant. A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463

U.S. 880, 893 & n.4 (1983)). The Court finds that reasonable jurists would not find this Court's merits rulings debatable. Therefore, a COA will not issue.

Accordingly,

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus is **DISMISSED**.

**IT IS FURTHER ORDERED** that the Clerk of Court should enter judgment and close this case.

**IT IS FURTHER ORDERED** that, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, in the event Petitioner files an appeal, the Court denies issuance of a certificate of appealability.

Dated this 7th day of November, 2018.

_Lynnette C. Kimmins_
Honorable Lynnette C. Kimmins
United States Magistrate Judge